# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION
# CASE NO. 5:10-CV-149

**JODY LYN SMITH**                                                                             **PLAINTIFF**

v.

**PFIZER, INC.**                                                                                 **DEFENDANT**

## MEMORANDUM OPINION

This matter is before the Court upon Defendant Pfizer Inc.'s Motion for Summary Judgment (Docket #32). Plaintiff has responded (Docket #37). Defendant has replied (Docket #38). This matter is now ripe for adjudication. For the following reasons, Defendant's motion is GRANTED.

## BACKGROUND

Plaintiff Jody Lyn Smith, 41, began having epileptic seizures when he was approximately 13 years old. In 1982, Plaintiff was prescribed Dilantin for treatment of epilepsy. He continued to take this medication, along with phenobarbital, for 26 years. Plaintiff attended Murray State University and pursued a career in the television industry, where he was promoted to nightly news producer for a local television station. He also acted in several local theater productions, but had to stop in 2008. Plaintiff alleges that, due to afflictions caused by Dilantin, he is now unable to complete daily functions and has difficulty walking, getting dressed, preparing meals, bathing, and performing basic household chores.

In the late 1980s, Plaintiff began seeing a neurologist, Dr. Howard Kirshner. Dr. Kirshner kept Plaintiff on a regimen of Dilantin and phenobarbital to control his seizures until 2009. Dr. Kirshner acknowledged in his deposition testimony that he was aware of the side effects of Dilantin at the time he prescribed the drug to Plaintiff. These effects include

peripheral neuropathy related to chronic use of the drug and becoming toxic if the Dilantin level is too high.

> Q: With respect to Dilantin, you knew well before 2000 that there were side effects of neuropathy and ataxia, correct?
>
> A: Yes.

Dr. Kirshner Depo., DN 32-2, p. 165. Dr. Kirshner noted that peripheral neuropathy means that something is wrong with the peripheral nerves. Symptoms include numbness, loss of feeling, tingling, burning, pins and needles, and sometimes painful, unpleasant sensations. Other symptoms include weakness and loss of coordination (ataxia). Dr. Kirshner Depo., DN 32-2, p. 38-40, 44.[1]

In October of 2003, Plaintiff began complaining of numbness in his legs, feet, and hand. He had an MRI and EMG which were interpreted as normal. Dr. Kirshner added folic acid to Plaintiff's regimen, which greatly reduced these symptoms. Dr. Kirshner attributed Plaintiff's numbness to either "early neuropathy secondary to Dilantin or a lumbar radiculopathy." Dr. Kirshner Records, DN 37-4, p. 23. In a follow-up visit on December 1, 2003, Dr. Kirshner noted that the normal EMG and MRI were against radiculopathy, and the normal EMG was also against polyneuropathy, "but I still wonder about dilantin toxicity." DN 37-4, p. 19.

In 2004, Plaintiff broke his ankle. He did well after physical therapy, but then began complaining that he was having difficulty walking and was off balance. In November of 2006, Plaintiff saw Dr. Troy Nelson, D.O. Plaintiff indicated to Dr. Nelson that he had weakness in both legs and that he "believes it to be due to neuropathy from meds." Dr. Nelson Records, DN

---

[1] Dr. Kirshner states that "[a]taxia is basically a loss of coordination or a loss of balance." DN 32-2, p. 44.

35-2, p. 5. Plaintiff met with Dr. Kirschner on December 7, 2006, noting that he was still experiencing numbness in his feet. Plaintiff felt the numbness was stable and was happy on Dilantin and phenobarbital.

Plaintiff's symptoms worsened in 2007. In January of 2007, Plaintiff met with Dr. Raymond de la Rosa, who believed Plaintiff was suffering from "some degree of osteoporosis or osteopenia secondary to both Dilantin and phenobarbital use." DN 37-5, p. 3. Plaintiff was later referred by Dr. Nelson to Amy Jeffords, a physical therapist with Bio Kinetics. On May 9, 2007, Ms. Jeffords noted that Plaintiff reported a two year history of unsteady gait and decreased balance. He reported that Dilantin could be giving him some difficulty as well.

On December 10, 2007, Plaintiff reported his balance difficulties to Dr. Kirshner. Dr. Kirshner noted his suspicion that the balance difficulty was related to Dilantin toxicity. Accordingly, Dr. Kirshner reduced Plaintiff's Dilantin dose, despite Plaintiff's concerns about a breakthrough seizure. Plaintiff contacted Dr. Kirshner by email on January 22, 2008.

> My balance remains unchanged since my office visit last month and the switch to a lower level of Dilantin (50 mg lower). I feel unsteady while walking and sometimes while standing, and cannot get up and down stairs as well as I should. I'll have blood drawn this week (or early next) to get levels checked. I'm very concerned about this. I realize my Dilantin level was quite high for a long time, so maybe it's just taking a while to get out of my system.

Smith Email, DN 32-8, p. 2. After reviewing Plaintiff's blood work, Dr. Kirshner noted that the Dilantin level was low enough that the toxic side effects should go away within a few days. "If you are still feeling off balance, I would doubt that the dilantin is to blame." *Id.* At Plaintiff's follow-up appointment on February 4, 2008, Dr. Kirshner noted, "I initially suspected that the balance difficulty was related to Dilantin toxicity, but it has persisted. This could represent long-term phenytoin toxicity." Dr. Kirshner Records, DN 38-2, p. 6. Dr. Nelson's records from

3

February 16, 2008, indicate that "[t]he patient states he was seen by Dr. Kirshner approximately 3 to 4 weeks ago, at which time his Dilantin and phenobarbital levels were changed secondary to questionable chronic side effects related to vertigo and imbalance." Dr. Nelson Records, DN 35-2, p. 10. Dr. Nelson diagnosed Plaintiff with seizure disorder and "[g]ait abnormality secondary to chronic Dilantin and phenobarbital use." Dr. Nelson Records, DN 35-2, p. 13.

On March 31, 2008, Dr. Kirshner noted that Plaintiff's balance was still "off." Plaintiff complained of an unsteady gait and poor balance to Dr. Nelson on April 18, 2008. On October 2, 2008, Dr. Kirshner discussed alternatives to Dilantin and phenobarbital, but Plaintiff wanted to remain on his current regimen. Dr. Kirshner also noted in his report that Plaintiff "likely has a mild peripheral neuropathy." Dr. Kirshner Records, DN 35-1, p. 9. On July 29, 2009, Plaintiff again complained to Dr. Kirshner of being "off balance" and experiencing numbness in his feet and legs.

Plaintiff was referred to a neurological specialist, Dr. Donofrio, in November of 2009. Dr. Donofrio noted that Plaintiff's neurological exam was abnormal and "[t]he peripheral neuropathy and the cerebellar symptoms are likely secondary to long standing dilantin use." Dr. Donofrio Records, DN 37-3, p. 8. "His gait is consistent with a midline anterior cerebellar dysfunction which may be secondary to the dilantin." *Id.* Plaintiff was taken off Dilantin in November of 2009. Additional testing was performed December 10, 2009. On January 20, 2010, Dr. Jacqueline Carter-Matsapola examined Plaintiff and noted that "he has Dilantin-induced ataxia . . . ." Dr. Carter-Matsapola Records, p. 2. On February 1, 2010, Plaintiff met again with Dr. Kirshner who noted that Plaintiff's seizure disorder was now treated with the drug Keppra and phenobarbital.

4

Plaintiff filed suit against Defendant in McCracken Circuit Court on July 8, 2010. The case was removed to this Court on July 30, 2010. Plaintiff's Complaint asserts four claims for relief: (I) Negligence; (II) Failure to Warn; (III) Breach of Implied Warranty; and (IV) Punitive Damages. This matter is currently set for trial on October 11, 2011. Defendant filed the present motion for summary judgment on April 19, 2011. The Court now considers this motion.

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

**DISCUSSION**

Defendant asserts three bases for summary judgment: (1) Plaintiff's claims are barred by the one year statute of limitations period for personal injury claims; (2) Plaintiff cannot establish that any alleged failure to warn proximately caused his injuries; and (3) Plaintiff's warranty claim must fail because of a lack of privity. In his response to the motion for summary judgment, Plaintiff withdrew his claim for breach of warranty. The Court now addresses Defendant's statute of limitations argument.

Under Kentucky Revised Statutes section 413.140, "[a]n action for an injury to the person of the plaintiff" shall be brought within one year after the cause of action accrued. Ky. Rev. Stat. Ann. § 413.140(1)(a). A personal injury cause of action accrues when the injury occurs or "when the plaintiff first discovers the injury or should have reasonably discovered it." *Roman Catholic Diocese of Covington v. Secter*, 966 S.W.2d 286, 288 (Ky. Ct. App. 1998). Kentucky courts apply this discovery rule "to cases involving latent injuries arising from exposure to harmful substances." *Id.* "According to Kentucky case law, a cause of action accrues, and the limitations period begins to run, when 'the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has been injured but also that his injury may have been caused by the defendant's conduct.'" *Cantrell v. Ashland Oil, Inc.*, Nos. 2006-SC-000763-DG, 2007-SC-000818-DG, 2010 WL 1006391, at *10 (Ky. Mar. 18, 2010) (quoting *Louisville Trust Co. v. Johns-Manville Prods. Corp.*, 580 S.W.2d 497, 501 (Ky. 1979)).

Defendant argues that all of Plaintiff's claims are barred by the one year statute of limitations because Plaintiff knew prior to July 8, 2009, that Dilantin may have caused the symptoms he experienced related to peripheral neuropathy and ataxia. Defendant asserts that the

evidence demonstrates that Plaintiff became aware that Dilantin could be the cause of symptoms associated with peripheral neuropathy in December of 2003. In addition, by May of 2007, Plaintiff was aware that Dilantin could cause balance difficulties, or ataxia.

In contrast, Plaintiff argues that the first time testing revealed a diagnosis of peripheral neuropathy and ataxia was not until December of 2009. It was not until this point that Plaintiff was taken off Dilantin. Although Dr. Kirshner had suspicions, he never made a definitive diagnosis and Plaintiff believed that Dr. Kirshner was just speculating. "If Dr. Kirshner had any degree of medical certainty of the cause of Plaintiff's injuries, he would have immediately and permanently taken Plaintiff off of Dilantin." Pl.'s Resp., DN 37-1, p. 11. Plaintiff also argues that he could not have known the cause of his injuries until he stopped taking Dilantin because this permitted his neurologists to determine that he was suffering a permanent injury and not just injuries associated with toxic levels of Dilantin. Plaintiff believes the statute of limitations commenced in either November of 2009 when Plaintiff was taken off Dilantin or December of 2009 when Plaintiff underwent further testing.

According to Plaintiff's medical records, he first complained of numbness in his right leg, left foot, and left hand in October of 2003. Dr. Kirshner noted: "Regarding the numb sensations, we considered either an early neuropathy secondary to Dilantin or a lumbar radiculopathy." DN 37-4, p. 23. Dr. Kirshner directed Plaintiff to begin taking folic acid. In December of 2003, Plaintiff's EMG and MRI ruled out radiculpathy and "[t]he normal EMG is also against a major polyneuropathy, but I still wonder about dilantin toxicity." DN 37-4, p. 19. Plaintiff does not dispute that Dr. Kirshner had told him that neuropathy was a side effect of Dilantin in 2003. *See* Pl. Depo., DN 32-4, p. 102-03.

7

In his January 25, 2010, deposition, Plaintiff acknowledged conversations with his healthcare providers prior to 2008 regarding the possibility of neuropathy being caused by Dilantin. Pl. Depo., DN 32-4, p. 52; *see also* Pl. Depo., DN 32-4, p. 69 (Q: "So in November of 2006, you were aware that your neuropathy symptoms were related to Dilantin?" A: "Yes."). He further admitted that he was aware he could continue to suffer neuropathy if he remained on Dilantin. *Id.* at 53.

Plaintiff first noticed balance issues in 2005. His first complaint of an unsteady gait appears in Dr. Nelson's records and the BioKinetics evaluation from May of 2007. These records fail to link Plaintiff's problems with Dilantin. In December of 2007, however, Dr. Kirshner noted that "I suspect that the balance difficulty is related to Dilantin toxicity." DN 37-4, p. 12. Plaintiff notes in his deposition testimony that "[a]ny balance issues in discussions that I had with Dr. Kirshner connected to Dilantin were never – he was never – he never fully linked it to Dilantin. It was a guess." Pl. Depo., DN 37-2, p. 78. His testimony also states:

> Q: But you agree with me that Amy Jeffords on May 9 of 2007 documented that you reported that since the ankle fracture, you had noticed a steady decline in balance and gait activities. You state you are currently taking Dilantin for epilepsy and have been since the age of 13, and you feel that this could be giving you some of the difficulty as well, correct? That's what it says?
>
> A: Yes, that is what that says.
>
> Q: So you were aware in May of 2007 that the balance and ataxia symptoms that you were having could have been related to Dilantin?
>
> A: That was a guess of mine.
>
> Q: It's a yes or no question, Mr. Smith. You were aware in May of 2007 that the balance and gait problems you were suffering could have been related to Dilantin, yes or no?

8

A: Yes.

Pl. Depo., DN 32-4, p. 67.

In February of 2008, Plaintiff met with Dr. Kirshner again because he was feeling "off balance" and had experienced a few falls. Dr. Kirshner notes, "I initially suspected that the balance difficulty was related to Dilantin toxicity, but it has persisted. This could represent long-term phenytoin toxicity." DN 37-4, p. 11. That same month, Dr. Nelson diagnosed Plaintiff with "[g]ait abnormality secondary to chronic Dilantin and phenobarbital use." DN 35-2, p. 13. In October of 2008, Dr. Kirshner discussed alternatives to Dilantin with Plaintiff and noted that "[h]e likely has a mild peripheral neuropathy." DN 37-4, p. 7.

In an email from Plaintiff to Dr. Kirshner on June 20, 2009, Plaintiff indicated that he was becoming more concerned about his gait and balance difficulties:

> I am rapidly losing my ability to walk. I have an appointment with you next month, and would like to focus on this problem, and hopefully find a solution. I strongly believe that this is a side effect of Dilantin, as we've previously discussed. See you next month.

DN 38-3, p. 3. In late 2009, Dr. Donofrio noted an abnormal neurologic exam and commented that "[t]he peripheral neuropathy and the cerebellar symptoms are likely secondary to long standing dilantin use. His gait is consistent with a midline anterior cerebellar dysfunction which may be secondary to the dilantin." DN 37-3, p. 8. Plaintiff was taken off Dilantin. In September of 2010, after Plaintiff had filed this lawsuit, Dr. Kirshner send an email to Plaintiff which stated "I really do not think that the balance problem is all from Dilantin, since it should have gotten better, and I am also bothered by the upgoing toe sign. I think there may be a separate neurological problem." DN 38-3, p. 2.

"Once an individual realizes that he has been injured, his cause of action begins to accrue

even if he does not yet realize the extent of his injury." *Van Landingham v. Georgia Pacific Corp.*, No. 2007-CA-002601-MR, 2009 WL 2475258, at *2 (Ky. Ct. App. Aug. 14, 2009) (citing *Caudill v. Arnett*, 481 S.W.2d 668, 669 (Ky. 1972)). A diagnosis is not necessarily required. *Id.* The present lawsuit was filed on July 8, 2010. Thus, if Plaintiff's claims accrued prior to July 8, 2009, his lawsuit is barred by the one year statute of limitations. *See* Ky. Rev. Stat. Ann. § 413.140(1)(a). The Court finds that Plaintiff discovered, or should have discovered, that he had been injured and that Dilantin may have caused his injury prior to July 8, 2009.

Plaintiff first experienced possible symptoms of neuropathy in 2003 and acknowledges that he was aware that these symptoms could have been caused by Dilantin.[2] Although his symptoms of numbness somewhat subsided with the addition of folic acid to Plaintiff's regimen, he continued to experience numbness, which migrated to different parts of his extremities and which Plaintiff reported as "stable." *See* Dr. Kirshner Records, DN 35-1, p. 10 (dated December 7, 2006, noting that Plaintiff had numbness in his legs two years ago and now complains of

---

[2] Dr. Kirshner's deposition affirms Plaintiff's statements. Dr. Kirshner stated as follows with regards to Plaintiff's awareness:

Q:  So as of – as of October 3, 2003, Mr. Smith would have been aware that neuropathy was a side effect of Dilantin use?

    MR. MILLER:    Object to form.

    THE WITNESS:    Yes, I would say definitely by then.

. . .

Q:  And he was also aware that he had some symptoms that indicated that he possibly had neuropathy caused by Dilantin, correct?

A:  Yes.

Dr. Kirshner Depo., DN 32-2, p. 120.

numbness in the soles of his feet). In 2006, Plaintiff reported to Dr. Nelson that he believed he had neuropathy due to his medications. DN 35-2, p. 5. He also reported a "history of neuropathy on both feet" to BioKinetics in 2007. DN 35-3, p. 2. By 2008, Dr. Kirshner suspected that Plaintiff's symptoms could be long-term and that he likely has peripheral neuropathy. DN 37-4, p. 7. The record, therefore, indicates that prior to July of 2009 Plaintiff was both aware that he had been injured and that Dilantin may be the cause of his injuries. Accordingly, summary judgment is granted as to Plaintiff's claims based on his peripheral neuropathy.

Plaintiff's first complaint of ataxia symptoms appears in his medical records in 2007, although he reports first experiencing such symptoms in 2005. In December of 2007, Dr. Kirshner noted that he suspected Dilantin as the cause of Plaintiff's balance problems,[3] and

---

[3] Dr. Kirshner's deposition notes that balance difficulty is synonymous with ataxia.

Q: Is balance difficulty associated with ataxia?

A: It's a synonym for ataxia.

. . .

Q: So balance difficulty means ataxia?

A: Right. You can have ataxia of an individual limb, but if you have ataxia in walking, you know, that's a balance problem.

Q: So as of December 10, 2007, Mr. Smith was complaining of ataxia, correct?

A: Yes.

Q: And you related that to Dilantin toxicity, correct?

A: Yes, I spelled that out this time.

reduced Plaintiff's dosage. Plaintiff's ataxia symptoms continued to worsen and in 2008, Dr. Kirshner discussed alternatives to Dilantin and phenobarbital with Plaintiff. Dr. Kirshner also noted that Plaintiff's balance problems could be related to "long term phenytoin toxicity." DN 37-4, p. 7. In June of 2009, Plaintiff's email to Dr. Kirshner noted he was rapidly losing his ability to walk and that he "strongly believe[s] that this is a side effect of Dilantin" as he had discussed with Dr. Kirshner. DN 38-3, p. 3. Although Plaintiff's deposition indicates his belief that Dilantin was linked to his balance problems was merely a "guess," there is sufficient evidence in the record to suggest that his doctors believed Dilantin may have been the cause and communicated this to Plaintiff. Thus, Plaintiff knew or should have known that Dilantin was the cause of his balance problems prior to July of 2009. Further, although Plaintiff may not have identified his balance problems as ataxia at the time, a cause of action may accrue even if a plaintiff is unaware of the full extent of his injuries.[4]

Because the Court finds that Plaintiff discovered or should have discovered his injuries and that Dilantin may have been the cause of his injuries prior to July of 2009, the one year statute of limitations period bars Plaintiff's lawsuit. Summary judgment is granted in favor of Defendant.

---

Dr. Kirshner Depo., DN 32-2, p. 128.

[4]This reasoning also applies to Plaintiff's argument that his claims related to neurodegeneration should survive the statute of limitations. As a preliminary matter, the Court notes that Plaintiff's Complaint does not even mention neurodegeneration. Even so, Dr. Donofrio's report indicates that Plaintiff's gait problems were consistent with his neurodegeneration. DN 37-3, p. 8. Thus, Plaintiff was aware of the injury, although not necessary the full extent of the injury, and he was also aware that this problem may have been caused by Dilantin. Plaintiff himself noted that he was losing the ability to walk and strongly believed the problem to be related to his use of Dilantin. *See* DN 38-3, p. 3.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.

An appropriate order shall issue.